## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA GAINESVILLE DIVISION

**FREDRIC J. GOMBASH,**

    **Plaintiff,**

**vs.**                          **Case No. 1:12cv194-CAS**

**CAROLYN W. COLVIN,[1]**
**Acting Commissioner of Social Security,**

    **Defendant.**

_____/

## MEMORANDUM OPINION AND ORDER

This is a Social Security case referred to the undersigned upon consent of the parties and reference by District Judge Maurice M. Paul.  Doc. 14.  The Court concludes that the decision of the Commissioner should be affirmed.

### I.  Procedural History of the Case

In a decision dated August 24, 2004, Plaintiff was awarded disability insurance benefits and supplemental security income as of November 20, 2003, based on a finding that Plaintiff's lower limb fracture equaled Listing § 1.06 under 20 CFR Part 404, Subpart P, Appendix 1.  R. 19, 35, 127-30, 487-90.  (Citations to the Record shall be by the symbol R. followed by a page number that appears in the upper right corner.)  On August 12, 2009, after a continuing disability review, it was determined that Plaintiff was no longer

---

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this case.

disabled as of August 1, 2009. R. 19, 37-43, 491-95. This determination was upheld upon reconsideration after a disability hearing by a state agency Disability Hearing Officer. R. 19, 47-60, 494.

Plaintiff filed a timely written request for a hearing before an Administrative Law Judge (ALJ). R. 66. On January 24, 2011, a video hearing was held in Ocala, Florida, with the Plaintiff appearing in Ocala and ALJ Apolo Garcia presiding over the hearing in Gainesville, Florida. Plaintiff and Joyce P. Ryan, an impartial vocational expert, testified at the hearing. R. 121-23 (Resume), 497-524. Plaintiff was represented by Pamela C. Dunmore, a non-lawyer. R. 19, 84-86.

On February 11, 2011, the ALJ entered an unfavorable decision finding that Plaintiff's disability ended on August 1, 2009, and that Plaintiff has not become disabled again since that date. R. 19-28. On June 27, 2012, the Appeals Council denied Plaintiff's request for review. R. 7-9, 14-15. On August 27, 2012, Plaintiff filed a complaint requesting judicial review of the Commissioner's final decision. Doc. 1. Both parties filed memoranda of law, docs. 19 and 20, which have been considered.

## II. Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The most recent favorable medical decision finding that the claimant was disabled is the decision dated August 24, 2004. This is known as the 'comparison point decision' or CPD." R. 21.

2. "At the time of the CPD, the claimant had the following medical determinable impairment: lower extremity fracture. This impairment was found medically equal section(s) 1.06 of 20 CFR Part 404, Subpart P, Appendix 1." R. 21.

3. "As of August 1, 2009, the date the claimant's disability ended, the claimant had not engaged in substantial gainful activity." R. 21

4. "The medical evidence establishes that the claimant did not develop any additional impairments after the CPD through August 1, 2009. Thus the claimant's current impairment is the same as the CPD impairment." R. 21.

5. "Since August 1, 2009, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1." R. 21.

6. "Medical improvement occurred as of August 1, 2009," and "is related to the ability to work because as of August 1, 2009, the claimant no longer had an impairment or combination of impairments that met or medically equaled the same listing(s) [sic] that was equaled at the time of the CPD." R. 22-22.

7. "Beginning on August 1, 2009, the claimant's impairment has continued to be severe." R. 22.

8. "[B]eginning on August 1, 2009, the claimant has had the residual functional capacity [RFC] to perform the full range of light work." R. 22.

9. "Beginning on August 1, 2009, the claimant has been unable to perform past relevant work" as a framing carpenter and construction worker II. R. 27.

10. "On August 1, 2009, the claimant was a younger individual age 18-49," and "has at least a high school education and is able to communicate in English." R. 27.

11. "Beginning on August 1, 2009, transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of 'not disabled,' whether or not the claimant has transferable job skills." R. 27.

12. "Beginning on August 1, 2009, considering the claimant's age, education, work experience, and [RFC], the claimant has been able to perform a significant number of jobs in the national economy." R. 27.

13. "The claimant's disability ended on August 1, 2009, and the claimant has not become disabled again since that date." R. 28.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[2]

A claimant's continued entitlement to disability benefits must be reviewed periodically. 20 C.F.R. § 404.1594(a). Here, after such review, the Commissioner determined that Plaintiff's benefits should be terminated. Generally, the Commissioner must determine if there has been any medical improvement in the person's impairments and, if so, whether the medical improvement is related the person's ability to work. *Id.*; *see* 20 C.F.R. § 404.1594(c) (discussing Commissioner's determination of medical improvement and its relationship to claimant's abilities to do work). Medical improvement is any decrease in the medical severity of a claimant's impairment that was present at the most recent finding of disability. 20 C.F.R. § 404.1594(b)(1). "[T]here

---

[2] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

can be no termination of benefits unless there is substantial evidence of improvement to the point of no disability." McAulay v. Heckler, 749 F.2d 1500, 1500 (11th Cir. 1985) (per curiam). In making such a determination, a 'comparison of the original medical evidence and the new medical evidence is necessary to make a finding of improvement.'" Id.; see Simone v. Comm'r of Soc. Sec. Admin., 465 F. Appx 905, 909 (11th Cir. 2012); (unpublished); Parrish v. Comm'r Soc. Sec. Admin., 334 F. Appx 200, 201 (11th Cir. 2009) (unpublished).

## IV. Old and New Medical Evidence

### A. Old Evidence

On November 20, 2003, Plaintiff fell off a scaffold and fractured his left leg (a tibial pillion fracture). R. 202-15, 218, 248-49. Richard Vlasak, M.D., performed surgery and placed an external fixator on Plaintiff's left leg. R. 218-19, 238-39, 242-47.

On March 25, 2004, Dr. Vlasak reported that Plaintiff was last seen at the Orthopedic Clinic on December 9, 2003, and was supposed to be seen four weeks after that, but "incidentally showed up in the [ER] on 3/10.2004 with increased pain," "was evaluated and subsequently discharged." R. 228, 230. He examined Plaintiff (for 15 minutes) and recommended a CT scan in order to evaluate his fracture completely. R. 228.

On April 2, 2004, Plaintiff had a CT scan. R. 226-27. Findings are made with two impressions: "1. The plafond portion of the distal tibial comminuted fracture shows healing, although there is 2mm of incongruity at the tibial plafond. More superiorly, the tibial fracture and fibular fracture are united. 2. Diffuse osteopenia." R. 226.

On April 12, 2004, Plaintiff presented to the Gainesville Family Institute for a general clinical evaluation with mental status. R. 248-51. Andres Nazario, Jr., Ph.D., LMFT, performed the evaluation. Dr. Nazario made the following diagnosis: "The symptoms described by Mr. Gombash and his presentation are consistent with a DSM-IV diagnosis 309.81 Post-Traumatic Stress Disorder [PTSD]." Dr. Nazario provided a summary and stated, in part: "He reports that he is very frustrated with his condition and does not have an outlet for his frustration at the present time. He does meet the criteria for PTSD. He appears able to concentrate, able to understand and follow directions. He appears able to interact with others appropriately. His reported medical difficulties need to be assessed by medical doctors in order to make a disability determination." R. 251 (emphasis added).

On April 19, 2004, Alan J. Harris, Ph.D., completed a Psychiatric Review Technique (PRT) and concluded, in part, that Plaintiff had mild limitations in restrictions of daily living, maintaining social functioning, maintaining concentration, persistence, or pace, and no episodes of decompensation. R. 252-63.

On June 11, 2004, Plaintiff complained of left lower extremity pain. R. 223. Upon examination, it was determined that Plaintiff's "lower tibial cancellous screw has fractured near its tibial insertion with adjacent lucency of the tibial cortex. There is stable alignment of the tibia and fibula. There is disuse osteopenia of the left leg and foot. There are no new acute fractures identified." Similar impressions are noted as interpreted by Suzanne T. Mastin, M.D. R. 223.

On July 6, 2004, Dr. Vlasak removed the external fixator and placed a short cast on Plaintiff's left leg, but noted that he expected Plaintiff to be non-weight bearing for at least seven more months. R. 218-19.

On July 16, 2004, Plaintiff required a second surgery after he was involved in a motor vehicle accident. R. 265-67, 286-87. On the same date, he was discharged in a long leg cast with instructions to remain non-weight bearing. R. 281. Although follow-up with Dr. Vlasak or another orthopedist was recommended, no such evidence appears in the record. R. 281.

Plaintiff's lower left leg impairment was found to equal Listing 1.06 on August 24, 2004. R. 288.

## B. New Evidence

Plaintiff visited the Shands University of Florida Clinic (Shands) in 2008 and 2009 reporting knee pain. R. 23, 306-11, 313-16, 378-88. Plaintiff had a limited range of motion in his knee which was mildly swollen and tender, but an x-ray of Plaintiff's left knee showed post-operative changes with no evidence of hardware failure. R. 309, 312, 315, 389. There is no evidence that Plaintiff followed up with an orthopedist as medical providers recommended for long-term management of his chronic knee pain. (For example, on January 27, 2009, Plaintiff presented for treatment when he "struck his hand in a car door." No mention is made of any complaints regarding his leg. R. 23, 291-305. There are other patient notes from January 16, 2009, reflecting that Plaintiff appeared at the ER regarding the hand incident. R. 370-83. A note regarding "psychiatric" states: "DENIES: Depression, Anxiety, Hallucinations, Abnormal Sleep," and other factors.

R. 372.)

On April 18, 2009, Eftim Adhami, M.D., M.S., examined Plaintiff at the request of the agency. R. 23-24, 392-93. Plaintiff reported left leg, low back, and neck pain and loss of left leg length. R. 392. He walked with a limp, but did not use any assistive device to walk. R. 393. On examination, Dr. Adhami found no back muscle spasm and the straight leg raising test was negative. R. 392. Plaintiff displayed normal sensation, reflexes, and strength, with no atrophy. Muscle strength is 5/5 in all muscles. R. 392-93. Dr. Adhami observed that Plaintiff's left leg was mildly enlarged with no current fluid, and mildly deformed with old scars on the knee, but retained a full range of motion despite pain with extreme flexion and extension. R. 393. Plaintiff's left ankle also had scars and a decreased range of motion. R. 393. Dr. Adhami noted that Plaintiff's claim of having a history of mental health treatment was not supported with any medical evidence and Plaintiff denied taking any mental health medications. R. 393.

On May 5, 2009, Reuben Brigety, M.D., a State agency physician, reviewed the medical evidence of record and opined that Plaintiff could perform a limited range of light exertional work, but avoid even a moderate exposure to hazards. R. 24, 397-404.

On June 30, 2009, William E. Beaty, Ph.D., examined Plaintiff at the request of the agency. R. 26, 405-407. "While he did not demonstrate involuntary movements, he walked with a slow and controlled gait." R. 405. Plaintiff reported "depression and a leg injury." R. 405. He related being in prison for sixteen months until his release in April 2008. R. 405-406. "At this time in general his health is ok; he is not taking any medications regularly." R. 406. Plaintiff denied receiving mental health services and

although he reported depression, he claimed that he was "able to handle it." R. 406.

On examination, Dr. Beaty noted that Plaintiff had an anxious and depressed mood and a

constricted and flat affect. R. 406. He scored very high on the Beck Depression and

Anxiety Inventory, "indicating a severe degree of depression and anxiety. He appears to

have suffered a lot of trauma both in his accidents and in the treatment of his various

injuries. The repetition of injuries over a relatively short period of time is unusual, and

appears to have given him an unusual perspective on his life." R. 407. Dr. Beaty

diagnosed PTSD, chronic and major depressive disorder, recurrent, severe, without

psychotic features. His Global Assessment of Functioning (GAF) score was 55.

R. 407.[3] Dr. Beaty opined that Plaintiff is able to manage his own funds. R. 408.

Dr. Beaty provided a narrative regarding Plaintiff's "ability to do work-related tasks:"

> While sitting, the client gets fidgety, his back starts to hurt after a while as do
> shoulders; when standing as problems with balance and pain in his left leg and
> must put most of his weight on his right leg. He tries to minimize lifting and caring,
> uses a cart to pull his purchases home when he go shopping. His hearing is
> adequate, he speaks well, and can travel with limitations related to sitting, standing

---

[3] The American Psychiatric Association: *Diagnostic and Statistical Manual of
Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000) includes the GAF Scale that
is primarily used by mental health practitioners. The GAF Scale is used to report "the
clinician's judgment of the individual's overall level of functioning" (with regard to only
psychological, social, and occupational functioning) and "may be particularly useful in
tracking the clinical progress of individuals in global terms, using a single measure." *See*
DSM-IV-TR 32-34. The GAF scale is divided into 10 ranges of functioning, each with a
10-point range in the GAF scale. *Id. See* Nichols v. Astrue, Case No.
3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012)
(discussing the GAF scale). A GAF scale rating of 51 to 60 indicates moderate
symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* The
"Commissioner has declined to endorse the GAF scale for 'use in the Social Security and
SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to
the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 F.
App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21,
2000)).

and walking for any period of time, and, psychologically, he is hyperalert about the possibility of danger of injury to himself so there is no relief or fun in leaving home. Understanding is adequate, but his memory for details may be faulty due at least to stress and diminished attention and concentration. His sustained concentration and task persistence varies depending on his motivation about the subject. He has quiet visits with a few friends, he does not dealing [sic] with children, and cannot address interpersonal tension and conflict in a constructive manner, tends to avoid.

R. 408.

On October 15, 2009, Nicolas Bancks, M.D., a state agency physician, reviewed the medical evidence of record and opined that Plaintiff could perform a limited range of light exertional work, but avoid concentrated exposure to vibration and hazards.

R. 24, 438-45. Dr. Bancks noted that Plaintiff had limited depth perception and color vision. R. 441.

On August 7, 2009, Robin Johnson, Psy.D., a state agency psychologist, performed a PRT, reviewed the medical evidence of record and opined that Plaintiff had no severe mental impairment. R. 409-23. Dr. Johnson provided one page of consultant's notes that included a brief summary of Dr. Beaty's July 2, 2009, report. Dr. Johnson concludes her analysis and states: "At this time there is no indication of a severe mental impairment. Since CPD date of 08/25/2004, there is no indication that claimant has taken advantage of any mental health intervention, although he continues to report and endorsed symptoms of depression and anxiety. Claimant's symptoms likely to improve with psychotropics and counseling." R. 421.

On October 15, 2009, Gary Buffone, Ph.D., a second State agency psychologist performed a PRT, conducted a review of the medical evidence, and opined that Plaintiff had no severe mental impairment. R. 424-37. He opined that Plaintiff had mild

Case No. 1:12cv194-CAS

difficulties in maintaining social functioning and no other functional limitations; had postural limitations occasionally; had limited color vision and depth perception; and no environmental limitations, except to avoid concentrated exposure to vibration and hazards. R. 434, 440-41.

On August 30, 2010, Dr. Beaty completed a check-box form indicating that Plaintiff would have numerous "marked" limitations of function. R. 446-48.

On October 14, 2010, Raul B. Zelaya, M.D., PA., examined Plaintiff at the request of the agency. R. 24-25, 474-77. Dr. Zelaya noted that Plaintiff did not use an assistive device, but walked with a mild antalgic gait and had stiff-legged ambulation due to his left lower extremity impairment. R. 475, 477. Due to the previous injuries, Plaintiff developed an extension and flexion contracture; the range of motion of his left knee did not extend beyond 45 degrees of flexion and -5 degrees of extension. R. 476. Additionally, Plaintiff's left knee had significant crepitation due to loss of cartilage and the length of his left leg had shortened by two inches. R. 476. Dr. Zelaya noted tenderness of the left shoulder and the base of the cervical spine with muscle spasm in the thoracic spine. R. 476. Straight leg raise testing was equivocal and deep tendon reflex testing was diminished; however, Plaintiff had normal sensation in all extremities and normal strength except in his lower left extremity which was 4/5. R. 477. Plaintiff was capable of understanding and following simple commands and produced normal speech. R. 477. Plaintiff was unable to walk on his heels or toes, stoop, squat, or arise from the sitting position to the standing position in a repetitive fashion. R. 477.

On October 14, 2010, Dr. Zelaya completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" form indicating that Plaintiff could lift or carry up to ten pounds frequently and twenty pounds occasionally; sit for six hours, stand for one hour, and walk for one hour in an eight-hour day, one hour continuously without interruption; occasionally use his left hand for overhead reaching; continuously reach in other directions; handle, finger, or push and pull with both hands; operate foot controls continuously with the right foot and frequently with the left foot; occasionally balance, stoop, and climb stairs and ramps; and never kneel, crouch, crawl, or climb ladders or scaffolds. R. 25, 481-84. Dr. Zelaya further indicated that Plaintiff could shop; ambulate without an assistive device; use public transportation; climb a few steps at a reasonable pace; prepare simple meals; feed himself; care for his personal hygiene; and sort, handle, and/or use paper files, but would require a companion to travel and would have difficulty walking a block at a reasonable pace on rough or uneven surfaces. R. 486.

## V. Legal Analysis

The issue before this Court is whether substantial evidence in the record as a whole supports the Commissioner's final administrative decision that Plaintiff's disability ended on August 1, 2009, because as of that date he was capable of performing work that exists in significant numbers in the economy.

### A. Substantial evidence supports the ALJ's RFC determination.

Plaintiff argues that the ALJ erred when he determined that Plaintiff had the RFC to perform a full range of light work. Doc. 19 at 14-18. Plaintiff also argues that the ALJ

erred when he did not include all of Plaintiff's impairments in the hypothetical questions posed to the vocational expert. Doc. 19 at 18-19. Both issues are considered in this section.

The ALJ provided a detailed summary of the relevant medical evidence and Plaintiff's hearing testimony, and Plaintiff does not suggest that relevant facts were omitted. R. 22-27. The medical evidence consists primarily of care Plaintiff received at Shands in 2008 and 2009; the one-time state agency consultative medical in-person evaluations conducted by Dr. Adhami on April 18, 2009, R.392-93, and Dr. Zelaya on October 14, 2010, R. 474-77, 481-86; and the mental health consultative psychological evaluation conducted by Dr. Beaty on July 2, 2009, R. 405-07, 446-48.[4] On the other hand, aside from patient records from Shands, R. 23, and the Department of Corrections, R. 25, this case does not involve consideration of traditional medical source patient records, whether by treating physician or psychologist.

After considering the evidence, the ALJ summarized his findings, including his credibility determination of Plaintiff. R. 26-27.[5]

> In terms of the claimant's alleged impairments, the undersigned finds that he is not fully credible regarding his symptoms, functional limitations or inability to work beginning on August 1, 2009. The claimant testified he continued to experience left leg pain, which hindered his daily ability to function. He further testified that his leg pain required him to elevate his leg 5-6 hours a day. However, the medical

---

[4] The state agency medical consultant assessments (non-examination) conducted by Drs. Brigety on May 5, 2009, and Dr. Bancks on October 15, 2009, are not favorable to Plaintiff. R. 24, 397-404, 438-45. The same can be said for the opinions of Dr. Johnson in her PRT. R. 409-23.

[5] The Eleventh Circuit has stated: "credibility determinations are the province of the ALJ." Moore, 405 F. 3d at 1212 ("The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.").

evidence reflects that the claimant had the ability to ambulate without assistance or an assistive device despite his left leg limp. The evidence further reflect[s] that the claimant was consistently found to have normal examinations of the left knee showing only mild diffuse swelling and tenderness to palpation and limited range of motion secondary to pain. The claimant's October 2010, examination revealed normal sensation of the upper and lower extremities with the exception of decreased sensation in the lower left extremity. The claimant was found to have the ability to frequently lift or carry a maximum of 10 pounds, occasionally lift or carry a maximum of 20 pounds but should refrain from lifting or carrying weight exceeding 20 pounds. He was also found capable of sitting 6 hours and standing or walking 1 hour in an 8-hour workday.

Regarding the claimant's alleged depression and anxiety; he testified that his impairments affected his concentration rendering him unable to finish tasks. However, in January 2009, the claimant denied having any of the classic symptoms for depression or anxiety including difficulty concentrating, mood changes, confusion or hostility. The claimant also denied abnormal sleep patterns, irritability, nervousness, increased stress or alcohol abuse or substance abuse. On July 2009, he denied receiving any mental health service or having suicidal ideations; he was oriented times four and his thought process was intact, organized and controlled. He had no observable hallucinations or perceptual disturbances and his judgment was moderately impaired (Exhibit 12F/3).

As for the opinion evidence, the undersigned gives weight to the assessment to [sic] the consultative evaluation of Dr. Zelaya and the opinions of the state agency medical consultants. Dr. Zelaya had the benefit of reviewing the claimant's entire medical history and performed a complete physical examination. Dr. Zelaya's findings are also consistent with the claimant's prior physical examinations, which showed full range of motion of left leg with mild enlargement and mild deformity without fluid.

The undersigned however gives little weight to the mental assessment of Dr. Beaty because it is inconsistent with the claimant's self-report that he had not received any mental health services. Dr. Beaty's assessment is also inconsistent with the claimant's prior examinations showing he was alert and oriented times three with no hallucinations, anxiety or delusions. Finally, Dr. Beaty's assessment is inconsistent with his own medical examination, in which he found the claimant's thought process was intact, organized and controlled; his thought content was also negative for delusions or paranoia and had no observable hallucinations or perceptual disturbances.

In sum, the above [RFC] assessment is supported by the medical records from Shands University of Florida; the consultative examinations of Doctors Adhami and Zeyala; the physical [RFC] assessments from the State's [sic] agency medical

Case No. 1:12cv194-CAS

consultants; and the observations and testimony received by the undersigned at
the hearing held on January 24, 2010.

R. 26-27.

Plaintiff agrees that he no longer meets the requirements of Listing 1.06, but
contends that there is no substantial evidence to support the ALJ's finding of medical
improvement. Doc. 19 at 14-18. Plaintiff equaled Listing 1.06 because he was unable
to ambulate effectively as a result of the fracture to his left leg. Plaintiff's fracture healed
over time, however, and, as of August 1, 2009, Plaintiff walked with a limp, but could
ambulate without any assistive device. R. 21-22, 393, 475. As noted by the ALJ, the
medical severity of Plaintiff's leg fracture decreased as Plaintiff regained his ability to
ambulate. As a result, the ALJ found that Plaintiff had medical improvement as of
August 1, 2009. R. 21-22.

Plaintiff also argues that the ALJ's RFC assessment is incorrect because he is
unable to perform the standing requirements of light exertional work according to
Dr. Zelaya. Doc. 19 at 16-18. The ALJ was not required to accept all the limitations
describe by Dr. Zelaya, however. The ALJ's RFC assessment is supported by other
evidence in the record apart from Dr. Zeyala's opinion.

The ALJ is required to review the evidence and formulate a RFC. 20 C.F.R.
§§ 404.1545(a)(3), 404.1546(c). Based on his consideration of the record, the ALJ here
determined that Plaintiff had the RFC to perform a full range of light work. R. 13;
20 C.F.R. § 404.1545. Substantial evidence supports this RFC assessment including
the medical records from Shands, the examination findings of Drs. Adhami and Zelaya,

the opinions of the State agency physicians, and the observations and testimony received by the ALJ. R. 27.[6]

Next, Plaintiff argues that the ALJ erred when he did not include all of Plaintiff's impairments in the hypothetical questions posed to the vocational expert. Doc. 19 at 18-19. The argument lacks merit.

During the hearing, the ALJ posed a hypothetical question to the vocational expert that incorporated most of the limitations Dr. Zelaya endorsed except for the limitation to standing and walking for one hour each in an eight-hour day. R. 519. Specifically, in his first hypothetical, the ALJ asked the vocational expert to assume an individual with Plaintiff's vocational profile who could lift and carry up to ten pounds frequently and twenty pounds occasionally; continuously reach, handle, finger, and feel and frequently push and pull with his right hand; occasionally reach overhead, frequently reach in all other directions, handle, finger, feel, push and pull with the left hand; operate foot controls continuously with the right foot and occasionally with the left foot; never climb, crouch, crawl, or kneel; occasionally stoop; not travel without a companion for assistance; and was unable to walk a block at a reasonable pace on rough or uneven surfaces. R. 519. In response, the vocational expert testified that Plaintiff could perform work as a cashier, an assembler, or an assembler of hospital products. R. 521.

---

[6] Although Dr. Zeyala limited Plaintiff to standing and walking one hour each in an eight-hour day, the ALJ was not required to incorporate that limitation into his RFC assessment. The ALJ gave some weight to Dr. Zelaya's assessment, R. 26, but was not required to give controlling weight because Dr. Zelaya is not Plaintiff's treating physician. *See* 20 C.F.R. § 404.1527. Overall, Dr. Zelaya's opinion is consistent with Plaintiff's ability to perform light work found by the ALJ and used to apply Medical-Vocational Rule (Grids) 202.21. R. 28.

In his second hypothetical, the ALJ asked the vocational expert to assume an individual with Plaintiff's vocational profile who could lift and carry ten pounds frequently and twenty pounds occasionally and could sit, stand, and walk for six hours in an eight-hour day. R. 521. The vocational expert responded that such an individual could perform the same three jobs previously identified (cashier, assembler, and assembler of hospital products) as well as the jobs of document preparer, cleaner, and toll collector. R. 522. This testimony provides an additional independent basis to support the ALJ's ultimate conclusion that Plaintiff is not disabled apart from the Grids.[7]

Finally, Plaintiff's brief argument that the ALJ ignored the limitations arising from Plaintiff's mental impairments is not persuasive. Doc. 19 at 19. The ALJ did not find Plaintiff's mental impairments were severe impairments. R. 21. Dr. Adhami noted that no evidence supported Plaintiff's claim to a history of mental health treatment. R. 393. Likewise, both Drs. Johnson and Buffone, the state agency psychologists, found Plaintiff's mental impairments non-severe. R. 409-23, 424-37.

Plaintiff admitted that he did not receive mental health treatment and told Dr. Beaty that he was "able to handle it." R. 406. Although, Dr. Beaty diagnosed PTSD and depressive disorder, the ALJ explained that Dr. Beaty's opinion was entitled to little weight because it is inconsistent with the medical evidence of record, including Plaintiff's

---

[7] As noted by Plaintiff, when the vocational expert was presented with additional factors, such as muscle spasms, severe pain, depression and anxiety, such a hypothetical individual would not be able to perform the work described above. Doc. 19 at 19 n.7; R. 522-23. As stated herein, substantial evidence supports the ALJ's consideration of the limited impairments he presented to the vocational expert.

Case No. 1:12cv194-CAS

admission that he had not received any mental health treatment, prior examination

showing no symptoms of mental illness, and Dr. Beaty's own examination findings.

R. 27. Because Plaintiff's mental impairments are not severe, they impose no significant

limitation on Plaintiff's ability to perform work-related activities that should have been

included in the ALJ's hypothetical questions. 20 C.F.R. § 416.905.

## VI. Conclusion

Considering the record as a whole, the findings of the ALJ are based upon

substantial evidence in the record and the ALJ correctly followed the law. Accordingly,

pursuant to 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's

application for Social Security benefits is **AFFIRMED** and the Clerk is **DIRECTED** to

enter judgment for the Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on May 15, 2013.

> **s/ Charles A. Stampelos**
> **CHARLES A. STAMPELOS**
> **UNITED STATES MAGISTRATE JUDGE**